# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LOUISE WOODS,** *et al.*, | : | **CIVIL ACTION** |
| *Plaintiffs,* | : | |
| | : | **NO. 24-0058** |
| **v.** | : | |
| | : | |
| **PHILADELPHIA HOUSING** | : | |
| **AUTHORITY,** *et al.*, | : | |
| *Defendants.* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                          MARCH 31, 2026

## MEMORANDUM OPINION[1]

**INTRODUCTION**

This civil rights action arises out of the tragic deaths of twelve individuals, including several children, following a horrific fire at an overcrowded residential apartment building owned and managed by the Philadelphia Housing Authority, (the "PHA").  The fire appeared to have been started after a five-year-old boy with developmental disabilities, troubled by an insect infestation in the building, lit his Christmas tree, causing the fire throughout the building.  There were no working smoke detectors in the building at the time, a fact allegedly known to some of the named defendants who are employees of the Philadelphia Housing Authority, (the "PHA").  As alleged, because of the lack of working smoke detectors, the occupants of the building were not alerted to the fire until it was too late.

Plaintiffs Louise Woods, ("Louise"), Tyhara Woods, ("Tyhara"), and Charles Scott, ("Charles"), as parents on behalf of Tyhara and Charles' minor children Z.S., C.S., and M.S., (collectively, "Plaintiffs"), filed this action under 42 U.S.C. § 1983 against: (1) the PHA; (2) Mary

---

[1]     This Memorandum Opinion is similar to the ones issued in the related cases: *Robinson v. Philadelphia Housing Authority*, No. 24-0055, 2025 WL 2263438 (E.D. Pa. Aug. 7, 2025), and *McDonald v. Philadelphia Housing Authority*, No. 24-0057, 2025 WL 2394043 (E.D. Pa. Aug. 15, 2025), which involved the same facts and circumstances.

Moc, Ericka Corley, Tabatha Revell, Truc Nguyen, Brahin Bilal, (the "Property Manager Defendants"); (3) Dinesh Indala,[2] (the "Renovator Defendant");[3] (4) Kelvin Jeremiah, Janea Jordon, (the "Policymaker Defendants"); (5) Earl Samuel, Ronald Henry, (the "Mechanic Defendants"), (collectively, the "PHA Defendants"); and (6) Nadine Fulton, and the City of Philadelphia, (collectively, the "City Defendants").[4]

Before this Court is the PHA Defendants' motion to dismiss filed pursuant to Federal Rule of Civil Procedure, ("Rule"), 12(b)(6), in which the PHA Defendants seek the dismissal of the second amended (the operative) complaint, arguing that Plaintiffs have not alleged facts sufficient to meet their pleading burden on each claim.  (ECF 41-2).  Plaintiffs oppose the motion.  (ECF 44).[5]  The issues raised in the motion have been fully briefed and are ripe for disposition.  For the reasons set forth, the PHA Defendants' motion to dismiss is granted.

---

[2]    In *Robinson* and *McDonald*, Defendant Indala was identified as a "Policymaker Defendant." *See Robinson*, 2025 WL 2263438, at * 1; *McDonald*, 2025 WL 2394043, at * 1.  In this case, the PHA Defendants identify Defendant Indala as "PHA Renovator."  (ECF 41-2 at pp. 13-14).  As such, this Court will identify Defendant Indala as the Renovator Defendant.

[3]    On January 5, 2024, Plaintiffs filed their initial complaint.  (ECF 1).  Plaintiffs filed an amended complaint on February 29, 2024 (ECF 12), and again on February 28, 2025, (the operative complaint), (ECF 39).  The PHA Defendants argue that claims against Defendant Gregory Hampson, incorrectly spelled as "Hampton" by Plaintiffs, should be dismissed because Plaintiffs' operative complaint fails to raise allegations related to Defendant Hampson.  (ECF 41-2 at p. 14 n.7).  Plaintiffs' do not oppose Defendant Hampson's dismissal.  (*See* ECF 44 at p. 37).  Accordingly, Plaintiffs' claims against Defendant Hampson are dismissed.

[4]    Plaintiffs named Defendant Fulton in their initial complaint, (*see* ECF 1 at ¶ 36), and the City Defendants in their first amended complaint, (*see* ECF 12 at ¶¶ 35-41).  This Court granted the City Defendants' motion to dismiss the first amended complaint.  (*See* ECF 32).  Plaintiffs did not name the City Defendants in their second amended complaint.  (*See* ECF 39).

[5]    This Court has also considered the PHA Defendants' reply.  (ECF 47).

**BACKGROUND**

When ruling on a motion to dismiss, courts must accept as true all factual allegations in the operative complaint and construe the facts alleged in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)). Here, the facts relevant to the underlying motion and alleged in the operative complaint are the following:

> The PHA is an agency and instrumentality of the Commonwealth of Pennsylvania that rents its apartments and houses to low-income families and individuals. The PHA operates a scattered site program as part of its public housing program, acquiring and renting single family and multiple unit properties across Philadelphia.

> The PHA acquired the property located at 869 North 23rd Street, Philadelphia, Pennsylvania, (the "Property"), in 1967. At the time, the Property was a single-family dwelling. The PHA converted the Property into a two-unit apartment comprised of Unit A (first floor) and Unit B (second and third floors). Unit B consists of four bedrooms, a kitchen, living room, and is approximately 1,600 square feet. Unit B's living room and kitchen are on the second floor, and its four bedrooms are on the third floor.

> Defendant Kelvin Jeremiah was the President and Chief Executive Officer of the PHA. As such, he was responsible for management and acted as the final policymaker in all aspects of PHA operations. Defendant Janea Jordon was the Senior Executive Vice President of Public Safety, Audit, and Compliance of the PHA. She was responsible for ensuring that policies, procedures, laws, and regulations were followed throughout the PHA. Defendant Dinesh Indala (together with Kelvin Jeremiah and Janea Jordon) was the Senior Executive Vice President of Housing Operations of PHA. He was responsible for overseeing all PHA public housing property management, maintenance activities, and employees.

> On or around August 17, 2011, Louise Woods signed a lease with the PHA to rent the Unit A apartment for herself, her daughter Tyhara, and her grandson, Z.S. By 2022, all six-named Plaintiffs were living in Unit A and fourteen people were living in Unit B. The PHA has standards regarding the number of occupants who may live in a PHA-operated unit. According to these standards, a four-bedroom unit may have no more than eight (8) occupants.

> The PHA had a "no-transfer" policy of only initiating housing transfers at the express request of residents, resulting in both overcrowded and underutilized units. Units are overcrowded when the total number of occupants on the lease exceeds the maximum number of allowable persons. Units are underutilized when

they are too large for the family size that they house, resulting in a lack of availability of larger units needed by larger families.

Applicable Philadelphia Business Code requires the installation of a 10-year non-removable sealed detector. The PHA often installs 9-volt battery-operated smoke detectors in its units that were not in compliance with this code.

Defendants Mary Moc, Ericka Corley, Tabatha Revell, Truc Nguyen, and Brahin Bilal, (the "Property Manager Defendants"), were property managers for the PHA's scattered site program. In February and March of 2015, the family living in Unit B (consisting of nine persons) requested a transfer to an appropriately sized unit. The Property Manager Defendants ignored the requests. In 2019, the family living in Unit B (consisting of 12 persons) completed Applications for Continued Occupancy. Even though Unit B was overcrowded, the Property Manager Defendants continued to renew the lease from 2015 until the final lease renewal on August 30, 2021, at which point there were 14 family member occupants.

Defendants Earl Samuel (a maintenance aid) and Ronald Henry (a maintenance mechanic), (collectively, the "Mechanic Defendants"), worked for PHA. On December 30, 2021, the PHA dispatched the Mechanic Defendants to Unit B to restore a water heater. When they arrived, Unit B residents told the Mechanic Defendants that the smoke detectors were also not working. Reports of inoperable smoke detectors are considered emergency conditions within a unit, triggering a mandatory 24-hour repair service. The Mechanic Defendants completed a quality check form that indicated that the smoke detectors had been checked and were operable.

Early in the morning of January 5, 2022, a fire broke out in Unit B. The fire spread quickly, and because the smoke detectors in the unit did not function, the residents were not alerted. Twelve of the fourteen Unit B residents were killed.

## LEGAL STANDARD

Motions to dismiss are governed by Rule 12. When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court "must accept all of the complaint's well-pleaded facts as true but may disregard any legal conclusions." *Fowler*, 578 F.3d at 210–11. The court must determine "whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679). The complaint must do more than merely allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Id.* (internal quotation marks and citations omitted). "[W]here the

4

well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.*  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts sufficient to "'nudge his or her claims across the line from conceivable to plausible.'" *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 570) (citation modified).

**DISCUSSION**

In the operative complaint, Plaintiffs assert civil rights claims against the PHA Defendants pursuant to 42 U.S.C. § 1983, ("Section 1983"); *to wit*:  at Count I – a *Monell* claim against the PHA Defendants premised on their alleged "no-transfer" policy and its custom of violating various governing laws; and at Count II – state-created danger claims against the PHA Defendants, premised on (1) the Property Manager Defendants' alleged reauthorization of the overcrowded Unit B lease contrary to laws pertaining to overcrowding, (2) the Renovator Defendant's alleged renovations and conversions that rendered the Property extremely dangerous, and (3) the Mechanic Defendants' alleged falsification of maintenance records wherein they claimed the completion of smoke detector quality checks.  The parties' arguments with respect to these claims are addressed below in inverted order.

***Plaintiffs' State-Created Danger Claims Against the PHA Defendants (Count II)***

At Count II of the operative complaint, Plaintiffs assert a Section 1983 state-created danger claims against the PHA employees. (ECF 39 at ¶¶ 183-197). The PHA Defendants move to dismiss these claims because Plaintiffs have not alleged facts sufficient to support, *inter alia*, the affirmative conduct and causation requirements of their claims. (ECF 41-2 at pp. 19-34).[6] This Court agrees.

Section 1983 enables a plaintiff to bring a civil action against any person who, acting under the color of state law, deprives another of rights, privileges, or immunities secured by the Constitution and/or laws of the United States. 42 U.S.C. § 1983. The statute does not confer rights on individuals; rather, it serves as a vehicle "for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). For a defendant to be liable under Section 1983, the plaintiff must show: (1) an underlying violation of the plaintiff's constitutional rights, (2) that

---

[6]    The PHA Defendants argue that, because state-created danger claims can only be brought against defendants in their individual capacities, Plaintiffs' state-created danger claims should be dismissed against the PHA (a municipality) and the Property Manager, Renovator, Policymaker, and Mechanic Defendants in their official capacities. (ECF 31-2 at pp. 20-21 n.18). This Court agrees. The PHA may be subject to liability pursuant to a *Monell* claim. Additionally, because a suit brought against a state official in their official capacity is "treated as a suit against the entity," *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), the Property Manager, Renovators, Policymaker, and Mechanic Defendants are to be treated as the same as the PHA. Accordingly, Plaintiffs' state-created danger claims against the PHA, as well as the Property Manager, Renovator, Policymaker, and Mechanic Defendants in their official capacities, are dismissed.

The PHA Defendants also argue that Plaintiffs' state-created danger claims should be dismissed against the Policymaker Defendants because Plaintiffs do not allege any facts to support the requisite personal involvement by these Defendants to impose liability. This Court agrees. *See Jordan v. Cicchi*, 617 F. App'x 153, 156 (3d Cir. 2015) ("[L]iability in a civil rights action pursuant to 42 U.S.C. § 1983 cannot be imposed on a supervisor . . . absent personal involvement in the alleged actions."); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988) (personal involvement can only be shown where supervisor directed actions of supervisees or actually knew of the actions and acquiesced in them). Notably, Plaintiffs do not identify any affirmative acts of the Policymaker Defendants in their response to the PHA Defendants' motion to dismiss. (ECF 44 at pp. 13-14). Accordingly, the state-created danger claims against the Policymaker Defendants in their individual capacity are dismissed. As such, this Court addresses Plaintiffs' state-created danger claims as they relate to: the Property Manager, Renovator, and Mechanic Defendants, in their individual capacities.

the defendant was personally involved in that violation, and (3) that the defendant acted "under color of state law." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002).

Here, Plaintiffs assert that the PHA Defendants violated Plaintiffs' Fourteenth Amendment due process rights by taking actions that ultimately resulted in serious bodily injury.  Specifically, Plaintiffs contend that Property Manager Defendants renewed the lease for the allegedly overcrowded Unit B apartment, the Renovator Defendant's renovations and conversion made the Property dangerous, and that Mechanic Defendants falsified maintenance records indicating that the smoke detectors had been checked and were operable and that these actions caused Plaintiffs' injuries.

The Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.  The Due Process Clause of the Fourteenth Amendment acts as a "limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989); *see also Mears v. Connolly*, 24 F.4th 880, 883 (3d Cir. 2022) ("The government has no general legal duty to keep people safe."); *Phillips*, 515 F.3d at 235 ("[T]he Due Process Clause does not impose an affirmative obligation on the state to protect its citizens.").  The purpose of the Due Process Clause is "to protect the people from the State, not to ensure that the State protected them from each other."  *DeShaney*, 489 U.S. at 196.

Further, the United States Court of Appeals for the Third Circuit, (the "Third Circuit"), held in *Horton v. Flenory*, 889 F.2d 454, 457 (3d Cir. 1989), that *DeShaney,* "stands for the harsh proposition that even though state officials know that a person is in imminent danger of harm from a third party, the fourteenth amendment imposes upon those state officials no obligation to prevent that harm."  However, the Third Circuit has held that a state may be liable for its failure to protect citizens against injuries inflicted or caused by private actors when the state "affirmatively places

7

the person in a position of danger the person would not otherwise have faced." *Kamara v. Att'y Gen.*, 420 F.3d 202, 216 (3d Cir. 2005).

To state a claim under the so-called state-created danger theory, Plaintiffs must plead facts sufficient to plausibly show the following elements:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotation marks and citations omitted).

Here, the PHA Defendants argue that Plaintiffs' operative complaint fails to satisfy the first, second, and fourth elements of the state-created danger doctrine. A failure to plead facts sufficient to support any of the four elements will result in the dismissal of the claim. *Phillips*, 515 F.3d at 236. As set forth below, this Court agrees and finds that Plaintiffs have failed to plead facts sufficient to meet the first element with respect to the Property Manager Defendants and the Renovator Defendant, and the fourth element with respect to the Mechanic Defendants. As such, this Court will limit its analysis to these elements.

### I.    *State-Created Danger Claims Against Property Manager Defendants*

To sustain a claim under the state-created danger theory of liability, the first element requires that the state's actions be the "foreseeable and fairly direct" cause of the ultimate harm. *Bright*, 443 F.3d at 281. "To adequately plead foreseeability . . . we require a plaintiff to allege . .

. an awareness of risk that is sufficiently concrete to put the [state] actors on notice of the harm." *Phillips*, 515 F.3d at 238. A defendant "kn[o]w[s], or should . . . kn[o]w, about the risk of his [or her] actions" when the "inherent risk" is a matter of "ordinary common sense and experience." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 240, 245 (3d Cir. 2016).

Plaintiffs must also plead facts sufficient to show that Property Manager Defendants' actions were the "fairly direct" cause of their harm, in that they "precipitated" or were the "catalyst" for the harm that occurred. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 910 (3d Cir. 1997). "[I]t is insufficient to plead that state officials' actions took place somewhere along the causal chain that ultimately led to the plaintiff's harm," as the acts must be the precipitating factor which "cause [the harm] to happen or come to a crisis suddenly, unexpectedly, or too soon." *Henry v. City of Erie*, 728 F.3d 275, 285 (3d Cir. 2013) (citation modified). Allegations fail the "fairly direct" element if they are "too attenuated" to show a "direct causal connection" between the action and the harm. *Morse*, 132 F.3d at 909.

Here, the Property Manager Defendants are alleged to have executed new leases for Unit B, granting continued occupancy for the increasing numbers of tenants year after year, despite knowledge that the apartment was overcrowded. The latest of the alleged lease renewals occurred on August 30, 2021, approximately 6 months before the deadly fire. (ECF 44 at p. 8). Plaintiffs also allege that the Property Manager Defendants required the occupants of Unit B to continue living in Unit B despite "multiple fire hazards, no operable smoke detectors, and other life-threatening violations." (ECF 38 at ¶ 193). Plaintiffs allege that the Property Manager Defendants were aware that Unit B was overcrowded and did not transfer the occupants prior to the January 5, 2022 fire. In light of these facts, the PHA Defendants argue that the alleged acts pled against the Property Manager Defendants are too attenuated to satisfy the first element of their state-created danger claim. This Court agrees.

9

In reaching its decision, this Court finds the Third Circuit's decision in *Henry* instructive. In *Henry*, plaintiff asserted a state-created danger claim against a local housing agency for approving and subsidizing an apartment that was not in compliance with the housing quality standards because it lacked the requisite smoke detectors or alternative means of egress. 728 F.3d at 278–79. The final inspection of the property occurred just months before the apartment caught fire and killed the tenant and her guest. *Id.* The plaintiff was aware that the apartment had failed multiple inspections. *Id.* at 279. While the Third Circuit found that the harm was "foreseeable," it found the harm was not "fairly direct." *Id.* at 283, 285.

In reaching this conclusion, the Third Circuit further explained that "[i]mproper licensure will often be too far removed from the ultimate harm" to have fairly directly caused the harm. *Id.* at 284–85. That is–"[d]efendants' actions were separated from the ultimate harm by a lengthy period of time and intervening forces and actions," and that the tenant had "actual notice" of the failed inspections but remained in the apartment. *Id.* at 284–85. As the Third Circuit explained, "[a]s unfortunate as the circumstances may be, '[w]hen a victim bears some responsibility for the risks she has incurred, it is even more difficult to say that the 'state' has 'created' the 'danger' to her by its affirmative acts.'" *Id.* at 286 (quoting *Jones v. Reynolds*, 438 F.3d 685, 694 (6th Cir. 2006)); *see also Van Orden v. Borough of Woodstown New Jersey*, 703 F. App'x 153, 157 (3d Cir. 2017) (holding that the state's action of creating more flooding by opening a dam during a hurricane was not the fairly direct cause of the plaintiff's death in the floodwaters because the plaintiff "chose to drive despite her knowledge of the existing travel ban").

Like in *Henry*, the Property Manager Defendants actions are too far removed to satisfy the fairly direct causation requirement. Similar to *Henry*, the Property Manager Defendants' actions "were separated from the ultimate harm by a lengthy period of time." 728 F.3d at 285. As noted, the Property Manager Defendants' most recent lease renewal occurred on August 30, 2021, and

10

the fire occurred on January 5, 2022.  As such, the Property Manager Defendants' actions of renewing the leases "were too far removed from the eventual harm to be deemed a fairly direct cause (of the harm suffered) by a reasonable juror."  *Van Orden*, 703 F. App'x at 157. Accordingly, the claims against the Property Manager Defendants are dismissed.

### II.    *State-Created Danger Claims Against the Renovator Defendant*

Plaintiffs also bring a state-created danger claim against the Renovator Defendant, alleging that, prior to Plaintiff Louise signing her lease on or around August 17, 2011, the Renovator Defendant oversaw the renovation and conversion of the Property from a single-family dwelling into a two-unit apartment comprised of Units A and B.  (ECF 39 at ¶¶ 75-83).  Plaintiffs further allege that the renovations and conversions allowed smoke to travel rapidly to bedrooms in Unit A in the event of a fire in Unit B, which rendered the Property extremely dangerous.  (*Id.* at ¶ 82). The PHA Defendants argue that the alleged acts pled against the Renovator Defendant are too attenuated to satisfy the first element of their state-created danger claim.  For similar reasons given above, this Court agrees.

Based on Plaintiffs' allegations, the Renovator Defendant's pre-August 2011 renovations occurred more than ten years prior to the January 2022 fire. As such, the Renovator Defendant's actions of renovating and converting the Property "were too far removed from the eventual harm to be deemed a fairly direct cause (of the harm suffered) by a reasonable juror." *Van Orden*, 703 F. App'x at 157.  Accordingly, the claims against the Renovator Defendant are dismissed.

### III.    *State-Created Danger Claims Against Mechanic Defendants*

The PHA Defendants argue that Plaintiffs have failed to plead facts sufficient to meet the fourth element of a state-created danger claim with respect to the Mechanic Defendants.  As noted, the fourth element requires that a state actor take affirmative acts that create a danger to the plaintiff or render the plaintiff more vulnerable to harm than if there had been no state action at all.  *Bright*,

443 F.3d at 281.  This fourth element is "often contested because of the inherent difficulty in drawing a line between an affirmative act and a failure to act." *L.R.*, 836 F.3d at 242.  This fourth element requires a plaintiff to allege facts to establish that state actors "used their authority to create an opportunity that otherwise would not have existed." *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996).  "It is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." *Bright*, 443 F.3d at 282; *see also Kneipp*, 95 F.3d at 1207 (affirmative acts require an action that inflicts harm, rather than inaction or a failure to prevent the infliction of harm).  In other words, "[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger." *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1374 (3d Cir. 1992). This requirement "serves . . . to distinguish cases where . . . officials might have done more . . . [from] cases where . . . officials created or increased the risk itself." *Morrow v. Balaski*, 719 F.3d 160, 179 (3d Cir. 2013) (quoting Ambro, J., concurring in part and dissenting in part).

In *Ye v. United States*, the Third Circuit divided the fourth element into three conditions: "(1) a state actor exercised his or her authority, (2) the state actor took an affirmative action, and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all."  484 F.3d 634, 639 (3d Cir. 2007) (quoting *Bright*, 443 F.3d at 281–82).  The first condition is simply a restatement of the "state actor" requirement for all Section 1983 claims.  *Id.* at 640.  The second and third conditions require that, in order to trigger the protections of the Due Process Clause, there must be an affirmative act by the state that deprives the plaintiff of the liberty to act on his or her own behalf.  *Id.* at 641–42 (citing *DeShaney*, 489 U.S. at 200); *Mears*, 24 F.4th at 884.  In other words, the state's action must "restrain the individual's freedom to act on his own behalf — through incarceration, institutionalization, or other similar restraint of personal liberty." *DeShaney*, 489 U.S. at 200.  This restraint of liberty

12

must "impermissibly limit[] the freedom of the plaintiffs to act on their own behalf, or bar[] their access to outside support." *D.R.*, 972 F.2d at 1376.

In their motion, Defendants argue that the Mechanic Defendants took no affirmative action by falsifying maintenance records. On this point, this Court disagrees. In the operative complaint, Plaintiffs allege that the Mechanic Defendants were dispatched to Unit B pursuant to a separate emergency repair and it is alleged that the Unit B's occupants informed them of the inoperable/missing smoke detectors. (ECF 39 at ¶ 117). Plaintiffs allege that Mechanic Defendants then "falsely reported that they performed quality checks on the smoke and carbon monoxide detectors, . . . [finding them] to be operable." (*Id.* at ¶¶ 118-119). Plaintiffs further allege that this falsification of records prevented the activation of the twenty-four-hour emergency repair policy, "which would have required the smoke detectors to be repaired within twenty-four (24) hours of them being reported inoperable." (*Id.* at ¶ 122). Viewing these allegations in the light most favorable to the Plaintiffs, as this Court must at this stage of litigation, this Court finds that Plaintiffs have plausibly alleged sufficient facts to show that the Mechanic Defendants took affirmative action by falsely reporting that they performed quality checks and that the smoke detectors were operable.[7]

With respect to the requisite affirmative conduct, this case is similar to *Cappel v. Aston Twp. Fire Dep't*, 693 F. Supp. 3d 467, 475 (E.D. Pa. 2023). In *Cappel*, EMTs visited the home of a severely ill suspected COVID-19 patient, took the patient's vital signs, which indicated a need for urgent medical care, but then failed to provide necessary treatment. *Id.* at 475–76. After their

---

[7] It is also alleged that Defendant Mechanics "never returned to replace the inoperable or missing smoke detectors that they had reported to be operable." (ECF 39 at ¶ 120). This allegation, however, is merely a failure to act rather than a misuse of authority. Therefore, it is not an affirmative action. *See Johnson v. City of Philadelphia*, 975 F.3d 394, 401 (3d Cir. 2020) ("[A]n alleged failure *to do something*, standing alone, cannot be the basis for a state-created danger claim.").

visit, the EMTs hid their actions, filed a false incident report that "[n]o [p]atient [was] [a]ssessed." *Id.* The patient died the next day. *Id.* at 476. The court held that the EMTs' action of filling out the false report was an affirmative act, rather than a failure to act. *Id.* at 485. The court held that "[h]ad [Defendants] merely *failed* to do something, they would not have written the report at all." *Id.*

Here, like in *Cappel*, Plaintiffs allege that Mechanic Defendants actively checked "no" on the quality checks report indicating that inoperable smoke detectors were not an issue. (ECF 39, at ¶ 119). Like in *Cappel*, where EMTs were alleged to have knowingly falsified records to hide their actions, here, Mechanic Defendants knowingly falsified records indicating that the Plaintiffs' smoke detectors did not need further attention. The Mechanics Defendants did not merely "[stand] by and do nothing." *Deshaney*, 489 U.S. at 203. Under these circumstances, Plaintiffs have plausibly pled that Defendant Mechanics took affirmative acts by falsely checking a box in a written report confirming that they had performed quality checks.

The PHA Defendants also argue that the Mechanic Defendants' falsification of records did not constitute the requisite restraint of personal liberty similar to incarceration or institutionalization. This Court agrees. The Third Circuit has distinguished between cases that do and do not exhibit a restraint on personal liberty. *See Vorobyev v. Bloomsburg Univ. of Pennsylvania*, 2022 WL 1499278, at *2 (3d Cir. May 12, 2022); *Mears*, 24 F.4th at 885. In *Vorobyev*, a nurse allowed a diabetic student who was very sick with high blood sugar to go to his dorm room alone without any further care. 2022 WL 1499278, at *1. The student later died from complications of his high blood sugar level. *Id.* Therein, the Third Circuit held that the nurse did not restrain the patient's liberty because he was still free to seek alternative forms of medical care and noted that "there is no allegation that [the nurse] affirmatively acted to *prevent* [the student] from seeing a specialist, much less that she *restrained* him from doing so." *Id.* (emphasis added).

Conversely, in *Mears*, a nurse was alleged to have accompanied a mother into a visitation room with her violent son and subsequently left the mother with no means of leaving the room, essentially trapping her in the room with her son.  24 F.4th at 883.  The Third Circuit held that the nurse's affirmative action of "exit[ing] the room" and "withdrawing her supervision mid-visit" *did* restrain the mother's personal liberty.  *Id.* at 885.  After the nurse left the mother alone in the room, the mother "could not leave [the visitation room] on her own."  *Id.*  Therefore, the nurse's actions affirmatively restrained the mother's liberty.  *Id.*

Here, the Mechanic Defendants' actions, while reprehensible, did not restrain Plaintiffs' liberty to seek alternative forms of relief.  Like in *Vorobyev*, where the nurse did not prevent or restrain the patient from seeking alternative medical assistance, here, there are no allegations that the Mechanic Defendants prevented or restrained Plaintiffs from seeking another avenue of help to repair smoke detectors.  Unlike in *Mears*, the Mechanic Defendants did not deprive Plaintiffs of their ability to leave the apartment, again report the non-working smoke detectors, and Plaintiffs had the opportunity to do so in the weeks between the Mechanic Defendants' repair visit and the deadly fire.  Therefore, Plaintiffs' state-created danger claims against the Mechanic Defendants fail the fourth element because the affirmative act of falsifying records did not restrain Plaintiffs' liberty.

### Plaintiffs' Monell Claims Against Defendant PHA (Count I)

At Count I of the operative complaint, Plaintiffs assert a *Monell* claim against the PHA Defendants premised on, *inter alia*, their violation of Plaintiffs' Fourteenth Amendment Due Process "rights to life and liberty in the form of personal bodily integrity."  (ECF 80, at ¶ 231).  The PHA Defendants moves to dismiss these claims on the basis that Plaintiffs have failed to allege

facts sufficient to plausibly show, *inter alia*, that an unconstitutional policy/custom exists and caused a constitutional harm.[8]

To establish *Monell* liability, a plaintiff must plead facts sufficient to plausibly show (1) a constitutional violation (2) that was caused by a municipal policy and/or custom. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978). *Monell* liability is often used to hold municipalities liable for constitutional violations by their employees, as municipalities cannot be held liable under Section 1983 on a *respondeat superior* theory. *Id.* at 691. As noted above, the state-created danger claims against the individual PHA Defendants fail. However, in *Johnson*, the Third Circuit acknowledged that "a municipality may be 'independently liable for a substantive due process violation' even if no municipal employee is liable." 975 F.3d at 403 n.13 (citations omitted). For *Monell* liability to attach, "there must still be a violation of the plaintiff's constitutional rights." *Id.* Therefore, this Court will assess the PHA's *Monell* liability for a constitutional violation caused by the PHA's alleged unconstitutional policies/customs.

To allege an unconstitutional policy, plaintiffs must "point to an official proclamation, policy or edict by a decisionmaker possessing final authority to establish municipal policy on the

---

[8]    Plaintiffs assert *Monell* claims against all the PHA Defendants at Count I of their operative complaint. (ECF 39 at ¶¶ 170-182). The PHA Defendants argue that, because *Monell* claims can only be brought against municipalities, Plaintiffs' *Monell* claim should be dismissed against the Property Manager, Renovators, Policymaker, and Mechanic Defendants in their individual capacities. (ECF 31-2 at p. 31 n.18). The PHA Defendants further argue that, because suing the Property Manager, Renovator, Policymaker, and Mechanic Defendants in their official capacity is no different than suing the PHA, the *Monell* claims against those defendants in their official capacity are redundant and should be dismissed. (*Id.*). This Court agrees. *See Porter v. City of Phila.*, 975 F.3d 374, 383 (3d Cir. 2020) ("Pursuant to the Supreme Court's holding in *Monell*, a *city* is only liable under § 1983 for constitutional violations that are caused by its official policies and customs." (emphasis added) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)); *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 581 (3d Cir. 2004) ("A suit against a governmental official in his or her official capacity is treated as a suit against the governmental entity itself."). Notably, Plaintiffs offer no response to this argument, and, in their response to the PHA Defendants' motion to dismiss, Plaintiffs argue that they have alleged a valid *Monell* claim against the PHA, *but no other defendants*. (ECF 44 at p. 31). Accordingly, Plaintiffs' *Monell* claims against the Property Manager, Renovator, Policymaker, and Mechanic Defendants are dismissed. As such, this Court addresses Plaintiffs' *Monell* claims only as they relate to the PHA.

relevant subject." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). If alleging an unconstitutional custom, the plaintiff must "evince a given course of conduct so well-settled and permanent as to virtually constitute law." *Id.* at 105–06. *Monell* claims predicated on a failure or inadequacy of training have the separate requirement of pleading a failure or inadequacy amounting to the municipality's deliberate indifference. *Id.* at 106. "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)). In other words, the plaintiff must show that the need to provide the identified training is "obvious" and that failure to provide it would "likely . . . result in the violation of constitutional rights." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

Importantly, there also must be a "direct causal link" between the policy/custom and the constitutional violation. *Id.* at 385. "A sufficiently close causal link between . . . a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom." *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir. 1990) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)).

Plaintiffs allege that their Fourteenth Amendment rights were violated by the PHA's custom of managing properties in violation of its governing laws and regulations under its (1) "no-transfer" policy/custom, (2) custom of non-compliant smoke detectors, and/or (3) failure to train employees. Assuming, without deciding, that Plaintiffs have adequately pled the existence of PHA policies/customs, Plaintiffs have failed to plead that these policies/customs *caused* constitutional harm.

17

## I.    *"No-Transfer" Policy/Custom*

Plaintiffs allege that the PHA adopted a "no-transfer" policy, whereby PHA employees authorized leases of overcrowded and underutilized units in violation of PHA policies requiring the mandatory transfer of overcrowded units.  They allege that this policy led to dangerous overcrowding of Unit B and prohibited unilateral transfers to correct housing imbalances that could have prevented the child who lit the fire from living in Unit B.  This Court disagrees.

Courts reject *Monell* claims when the causal link is too remote or speculative.  *Watson v. Abington Twp.*, 478 F.3d 144, 157 (3d Cir. 2007).  In *Watson*, the Third Circuit rejected *Monell* claims where the plaintiffs failed to tie alleged racist practices to the specific raid that harmed them, as there was only evidence of general allegations of racial profiling in traffic stops, not a policy/custom of raids.  *Id*.  Here, like in *Watson*, Plaintiffs do not sufficiently allege a "direct causal link" between the "no transfer" policy/custom and the harm they experienced.  A policy/custom of failing to transfer families in overcrowded units is too far attenuated from the specific harm at issue in this case – a deadly fire started by a child – to plausibly allege causation.  Thus, Plaintiffs fail to plead causation for the "no-transfer" *Monell* claim.

## II.    *Custom of Noncompliant Smoke Detectors*

Plaintiffs also allege a custom of installing non-compliant smoke detectors in violation of the Philadelphia Building Code.  Plaintiffs argue that if a 10-year nonremovable sealed detectors had been installed, the detectors in Unit B would have functioned properly at the time of the fire.  Again, Plaintiffs have not sufficiently alleged facts showing that there was a "direct causal link" between the use of non-compliant detectors and the harm alleged.  The theory rests on speculative assumptions that properly compliant detectors would have been working properly, alerted all residents to the harm, and would have allowed them to evacuate safely.

18

### III.    *Failure to Train Employees*

In a failure to train context, causation requires more than "showing that . . . employees could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991).   Instead, causation requires that "the injury [would] have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Canton*, 489 U.S. at 391.   The failure to train must have "a causal nexus with [the plaintiff's] injury." *Colburn*, 946 F.2d at 1030.   Plaintiffs broadly allege that the PHA had a pattern of not adequately training and/or supervising its own Commissioners, Executive Director, or other employees/representatives, which resulted in a lack of knowledge and/or training as to the smoke detector requirements.   The complaint does not explain how a well-trained employee would have prevented a child from starting a fire in his house.   Therefore, Plaintiffs' failure to train claim lacks the requisite "causal nexus" to the Plaintiffs' harm in the fire, and, as such, Plaintiffs fall short of adequately pleading their failure to train *Monell* claim.

Accordingly, because Plaintiffs' *Monell* claims do not adequately plead that the PHA's policies/customs caused a constitutional violation, the PHA's motion to dismiss Count I is granted.

**CONCLUSION**

For the reasons set forth, the PHA Defendants' motion to dismiss is granted and this matter is dismissed.   An Order consistent with this Memorandum Opinion follows.[9]

*NITZA I. QUIÑONES ALEJANDRO*, J.

---

[9]    In their response, Plaintiffs have requested leave to amend.   (ECF 44 at p. 37).   If they believe amendment is appropriate and feasible, they may file a properly supported motion for leave to amend in accordance with the applicable rules.   However, based on this Court's analysis, an amendment would not correct the deficiencies herein noted and would be futile.